888 F.2d 1385
 28 Fed. R. Evid. Serv. 1549
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Gladys A. CRABBE, Widow/Administratrix of the Estate of
Felix Crabbe, deceased, and on her own behalf,
Plaintiff-Appellant,
v.
Officer Martin C. TROUBLEFIELD, individually and as Police
Officer of Montgomery County, Defendant-Appellee,
and
Montgomery County Police Department, Captain Bromley,
individually and as Captain of the Silver Spring District
Station of the Montgomery County Police, Bernard D. Crooke,
individually and as Police Chief of Montgomery County,
Charles W. Gilchrist, individually and as County Executive
of Montgomery County, Defendants.
 No. 88-1127.
 United States Court of Appeals, Fourth Circuit.
 Argued April 13, 1989.
Decided Oct. 19, 1989.
 
 Emmanuel Damascus Akpan (Baird & Akpan, on brief) for appellant.
 Joann Robertson, Senior Assistant County Attorney (Clyde H. Sorrell, County Attorney, on brief) for appellee.
 Before WIDENER and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Gladys Crabbe appeals the decision of the district court in granting a directed verdict in favor of the defendant after presentation of her case brought to recover damages under 42 U.S.C. Sec. 1983. We are of opinion that the district court did not err in directing a verdict, and we affirm.
 
 
 2
 Mrs. Crabbe brought suit against Officer Troublefield and Montgomery County and other officials, alleging that the officer used excessive force during the arrest of her husband causing injuries which led to his subsequent death. All defendants except Troublefield were dismissed, to which exception is not taken here.
 
 
 3
 The relevant facts leading to the September 14, 1984 encounter with Troublefield began earlier on the same day. Felix Crabbe, a construction worker, did not go to work that morning. At approximately 9:40 a.m., he was arrested for attempted burglary. Pursuant to a description given over the police radio, Officer R. Anderson identified Crabbe sitting on the curb. Crabbe was sweating and in wet clothing with lacerations on his lower left leg. After being transported to the scene of the crime, the victim positively identified Crabbe as the man who had attempted to gain entrance to her apartment. Officer Anderson then placed Crabbe under arrest.
 
 
 4
 Anderson testified that after Crabbe was transported to the station, he began exhibiting unusual behavior including profuse sweating and unresponsive answers to direct questions. Officer Monaghan who helped transport Crabbe to the police station stated that when he handed Crabbe paper and pencil to write a statement about the attempted burglary, Crabbe wrote 10 times the following: "I was just trying to jump over the river and got all cut up." Monaghan further testified that after Crabbe was released after processing, around 12:30 p.m., he ran out of the station and down the street.
 
 
 5
 Troublefield came on duty at 4 p.m. that afternoon. While on routine patrol, he made a traffic stop at approximately 5:15 p.m. As Troublefield was asking the driver for his license and registration, he heard a screaming voice coming from behind him across the street. Troublefield turned and saw a man, later identified as Crabbe, whom Troublefield had never seen before, yelling and pointing in his direction. Crabbe's shirt was unbuttoned, his fly was down and the laces were out of his tennis shoes. Crabbe crossed the street toward the officer without checking traffic, causing cars to brake and skid.
 
 
 6
 Troublefield, warning Crabbe to stay back, backed away from Crabbe and from the driver's side door of the vehicle he had stopped until he bumped into his own vehicle. Crabbe approached Troublefield, lunged toward him, and with his fist struck a blow to Troublefield's shoulder. Troublefield then grabbed Crabbe by the front of the shirt with his left hand, swung his right arm with a Kel-Lite flashlight in his right hand, "hooking" Crabbe around the head (striking his head) and pulling him to the ground. Troublefield, while struggling with Crabbe, dropped the flashlight and keyed his microphone to call for help.
 
 
 7
 About that time, a man ran up, identified himself as a metropolitan police officer and asked Troublefield if he could be of assistance. Troublefield asked him to have the driver of the stopped vehicle turn off his engine. Troublefield was having difficulty in subduing Crabbe to allow him to put on handcuffs. Crabbe ignored the fact that he was being placed under arrest and continued to struggle. Troublefield testified that he never used the flashlight again in trying to control Crabbe. Other Montgomery County officers arrived and took Crabbe into custody.
 
 
 8
 Sergeant P. Chapwick was the senior officer to arrive on the scene after Crabbe was handcuffed. Sgt. Chapwick testified that while on the ground, Crabbe behaved irrationally, was abusive and shouted obscenities. It took three officers to subdue Crabbe and place handcuffs on him. Sgt. Chapwick stated that he saw no injuries to Crabbe's head. The sergeant saw Crabbe again about 6:30 p.m. and observed that he was polite and cooperative.
 
 
 9
 Crabbe, meanwhile, was taken to the police station to be processed for assault and battery and resisting arrest. He continued to refuse to cooperate and had to be forcibly escorted into the station. In the processing center, Crabbe was placed in a chair where he began to scream and act violently. The officers placed Crabbe on the floor to prevent injury he might receive from falling off the chair. He lay there thrashing, laughing, crying, and speaking in a foreign language.
 
 
 10
 Crabbe was placed on bail bond by the Commissioner and not released. Troublefield drove Crabbe to the Montgomery County Detention Center. When Crabbe arrived at the Center, he was talking incoherently. A paramedic who examined Crabbe informed Troublefield that the Center would not accept Crabbe. Troublefield would have to take him to Shady Grove Adventist Hospital to get a medical clearance. The Center personnel stated to Troublefield that Crabbe might be on drugs.
 
 
 11
 Crabbe was taken by Troublefield to the hospital emergency room. After examination, Crabbe was medically released. The diagnosis was "agitated-alcohol induced". Crabbe was given an injection of an anti-psychotic sedative and an injection of Thiamine and released. On the way back to the detention center, Troublefield noted that Crabbe became calmer. After Officer Troublefield delivered Crabbe to the detention center, he did not encounter Crabbe again.
 
 
 12
 The next day, September 15th, at approximately noon, Crabbe was found unconscious on the floor of his cell. He was returned to Shady Grove Adventist Hospital. The initial diagnosis was intracranial hemorrhage. The hospital records show that Crabbe's wife, plaintiff, informed the hospital that Crabbe had a five-year history of severe hypertension and had neglected himself and his medication. She elaborated further that Crabbe was an alcohol abuser resulting in various problems of late. Crabbe was to have entered a detoxification program, but had failed to do so.
 
 
 13
 Crabbe was comatose upon admission and remained neurologically unstable until his death on September 22, 1984. Plaintiff sought to admit at trial a dying declaration given to her by her husband in their native language. She stated that he told her that the police had beat him. The plaintiff also introduced and had admitted as evidence the autopsy report concluding that Crabbe had died by accident of intracranial cerebral trauma sustained in a fall.
 
 
 14
 The standard for granting a directed verdict requires a court to view the evidence in the light most favorable to the non-moving party and draw every legitimate inference in favor of that party. Smithy Breadon Co. v. Hadid, 825 F2d 787, 790 (4th Cir.1987). The case should be removed from the jury when any verdict in favor of the non-moving party necessarily will be premised upon "speculation and conjecture". Gairola v. Commonwealth of Virginia Department of General Services, 753 F.2d 1281, 1285 (4th Cir.1985).
 
 
 15
 The Supreme Court has only recently decided, in the case of Graham v. Conner, 57 U.S.L.W. 4513 (May 15, 1989), the test to determine whether an official has used excessive force in the course of an arrest, investigatory stop or other seizure. The court held that such excessive force cases are properly characterized as invoking the protections of the Fourth Amendment guaranteeing the right to be protected from unreasonable seizures of the person, and stated that the Fourth Amendment reasonableness inquiry is whether the officers' actions are " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 57 U.S.L.W. at 4516.
 
 
 16
 The only conclusion that can be drawn based on the facts and evidence presented is that Officer Troublefield acted in a reasonable manner in view of the course of events. The evidence shows that as Crabbe approached Troublefield in a frenzied manner, cursing him all the while, Troublefield retreated as far as he could, warning Crabbe to cease his advance. Nevertheless, Crabbe continued and struck the officer. The evidence further shows that Troublefield's version of grabbing and hooking Crabbe to pull him to the ground is nowhere contradicted and is corroborated by the passenger in the car pulled over by Troublefield.[1] The proposition forwarded by the plaintiff that the officer struck more than one blow is highly circumstantial as there were no witnesses who so testified, and the officers that encountered Crabbe thereafter testified that they saw no injuries about Crabbe's head or face. It should be noted that Crabbe's behavior was recorded as agitated and disoriented at the time of the first arrest earlier in the day. Additionally, after being released from the first arrest, there is approximately a four-hour period during which Crabbe's whereabouts are unknown.
 
 
 17
 Although Crabbe later died as a result of injuries to the head, none of the experts for either party could attribute the cause of injury to the actions of Officer Troublefield. The medical examiner listed the cause of death on the autopsy report as an accident with the injuries having been caused by a fall. The neuropathologist, Dr. Defendini, who testified on behalf of Crabbe admitted that the injury to his head could have occurred as much as 12 hours before due to the degree of manifestation of the injury when Crabbe was transported to the emergency room and the evidence of Crabbe's confusion earlier in the day.
 
 
 18
 Considering all the evidence in the case, there simply is no evidence that Troublefield did not act in an objectively reasonable manner in subduing Crabbe who was attacking him without provocation. The response to plaintiff's argument that Troublefield ignored his training to avoid hitting specific areas of Crabbe's body with the flashlight is that the officer was forced to make a split-second decision to escape injury, subdue Crabbe, and control the ensuing disruption of traffic on the roadway. It is difficult to second guess the scenario confronting the officer. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 57 U.S.L.W. at 4516.
 
 
 19
 As the district court judge correctly ruled, expert testimony concerning excessive force would not have been helpful to the trier of fact in this case. The circumstances under which Troublefield used the force necessary to gain control of Crabbe does not easily lend itself to an interpretation of which an expert opinion, based on the same situation, could improve or clarify. Fed.R.Evid. 702.
 
 
 20
 The dying declaration claimed to have been given by Crabbe to Mrs. Crabbe in his native language on his deathbed was properly ruled inadmissible. Crabbe conversed with his wife in Ga, which is his native tribal language from Ghana. Plaintiff argues that the statement meets Fed.R.Evid. 804(b)(2) as Crabbe is now unavailable to testify and, at the time the statement was made, was aware of his impending death. The district court ruled that there was a question as to the guarantee of trustworthiness of the statement due to Crabbe's condition. The district court relied on the opinion of the physicians and others who stated that Crabbe was in and out of consciousness and decided that Crabbe was probably incapable of carrying on intelligent conversation. Such exclusion of evidence is within the discretion of the trial judge and cannot be reversed absent abuse of discretion. See DeBenedetto v. Goodyear Tire & Rubber Co., 754 F.2d 512, 518 (4th Cir.1985). Having thoroughly considered the motion to proffer the dying declaration as evidence, the district court did not abuse its discretion in denying its admission.
 
 
 21
 Finally, plaintiff contends that the court abused its discretion in awarding costs against her. In the case of Flint v. Haynes, 651 F2d 970 (4th Cir.1981), cert. denied, 454 U.S. 1151 (1982), we held that the standard for the awarding of costs should not be the same as that of the awarding of attorney's fees to prevailing defendants in civil rights cases. Fees are awarded to prevailing defendants when the claim is frivolous, unreasonable, or without foundation. See Hughes v. Rowe, 449 U.S. 5, 14 (1980). Costs are assessed against the unsuccessful litigant as a matter of course, however, and will not be disturbed absent a showing of abuse of discretion. Flint, 651 F.2d at 973. We find no abuse of discretion.
 
 
 22
 The judgment of the district court is accordingly
 
 
 23
 AFFIRMED.